# In the United States Court of Federal Claims

No. 16-945C (BID PROTEST)

(Filed Under Seal: September, 30 2016 | Reissued: October 18, 2016)*

<table>
<tr><td>

DORADO SERVICES, INC.,

                      Plaintiff,

       v.

THE UNITED STATES OF AMERICA,

                 Defendant,

and

GEO INTERNATIONAL
MANAGEMENT, INC.,

                 Defendant-
                 Intervenor.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

Keywords: Post-Award Bid Protest;
Small Business Administration;
HUBZone Program; HUBZone Status
Protest; Bid Protest Jurisdiction; 35%
Residency Requirement

</td></tr>
</table>

*David J. Taylor*, Law Office of David J. Taylor, P.C., Washington, DC, with whom were *Joseph M. Goldstein* and *Andrew E. Schwartz*, Shutts & Bowen LLP, Ft. Lauderdale, FL, for Plaintiff.

*Daniel K. Greene*, Trial Attorney, Commercial Litigation Branch, Civil Division, with whom were *Steven J. Gillingham*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, U.S. Department of Justice, Washington, DC, for Defendant. *Beverley E. Hazelwood*, Trial Attorney, Office of General Counsel, U.S. Small Business Administration, and *Phillip E. Reiman*, Attorney, Air Force Legal Operations Agency, U.S. Department of the Air Force, Of Counsel.

*Douglas P. Hibshman*, Fox Rothschild, LLP, Washington, DC, for Defendant-Intervenor.

---

* This Opinion was originally issued under seal on September 30, 2016, and the parties were given the opportunity to request redactions. In light of the suggested redactions, the opinion is now reissued, with redactions of potentially sensitive information indicated by brackets.

## OPINION AND ORDER

**KAPLAN, Judge.**

This post-award bid protest involves a HUBZone status protest filed by Defendant-Intervenor GEO International Management, Inc. (GEO) in connection with the award of a HUBZone set-aside contract to Plaintiff Dorado Services, Inc. (Dorado). On August 27, 2016, for reasons that are set forth more fully below, the Court denied the government's motion to dismiss Dorado's complaint. See Order Denying Mot. to Dismiss, ECF No. 29.

Currently before the Court are Dorado's motion to supplement the administrative record and the parties' cross-motions for judgment on the administrative record. As discussed below, Dorado's motion to supplement the administrative record is **DENIED**. Further, the Court concludes that the Small Business Administration (SBA) did not err in deciding that certain individuals Dorado claims as its employees did not reside in HUBZones at the time of the award. Dorado concedes that if these employees do not count towards its total number of HUBZone-resident employees, Dorado cannot meet the HUBZone program's requirement that 35% of its employees reside in HUBZones at the time of the award. Therefore, Dorado's motion for judgment on the administrative record is **DENIED**, and the government's cross-motion for judgment on the administrative record is **GRANTED**.

## BACKGROUND

### I.     The HUBZone Program and the 35% Residency Requirement

To "encourage[] economic development in historically underutilized business zones"—i.e., "HUBZones"—Congress has created the HUBZone program for qualified small businesses. Understanding the HUBZone Program, SBA.gov, https://www.sba.gov/contracting/government-contracting-programs/hubzone-program/understanding-hubzone-program (last visited September 29, 2016); see also Small Business Reauthorization Act of 1997, Pub. L. 105-135, Tit. VI, 111 Stat 2592, 2627 (1997). Under the program, qualified small businesses receive federal contracting assistance in the form of contract set-asides and other preferences. Understanding the HUBZone Program, supra; see also 13 C.F.R. § 126.100.

To participate in the program, a small business must first obtain certification from SBA. See 13 C.F.R. § 126.300. To become certified, the small business must (among other things) meet the program's 35% residency requirement, which mandates that "[a]t least 35% of the [business's] employees must reside in a HUBZone."[1] Id. § 126.200(b)(4). After obtaining certification, a small business must still meet a variety of other requirements to secure a HUBZone award. See id. § 126.601. As is most relevant

---

[1] The methods for determining whether an employee resides in a HUBZone are discussed in detail below.

here, the business "must be a qualified HUBZone [small business] both at the time of its initial offer and at the time of [the] award in order to be eligible for a HUBZone contract." Id. § 126.601(c). Thus, the small business must meet the 35% residency requirement both on the date of the offer and at the time of the award. See id.

## II.     The Request for Proposals, Contract Award, and GEO's Protest

On June 11, 2015, the U.S. Department of the Air Force (Air Force) issued Request for Proposals (RFP) No. FA3047-15-R-0011 to secure "Municipal Solid Waste collection and disposal" services for its installations at Joint Base San Antonio. Administrative Record (AR) Tab 3 at 11, 128. The RFP was 100% set aside for HUBZone small businesses. Id. at 11. The Air Force intended to award a Firm Fixed Price, Indefinite Delivery/Indefinite Quantity contract to the lowest-priced technically acceptable offeror. Id. at 124. The Air Force expected that services under the contract would extend for up to five years. See id. Tab 1 at 3; id. Tab 16 at 426.

On July 27, 2015, the Air Force received proposals from Dorado and GEO. Id. Tabs 8–9; see also Compl. ¶ 5. It awarded the contract to Dorado on October 29, 2015. AR Tab 18 at 468; see also id. Tab 15 at 420–23 (source selection decision).

A few days later, on November 5, 2015, GEO filed a HUBZone status protest with SBA.[2] Id. Tab 18 at 469–70; see generally 13 C.F.R. §§ 126.800–05 (setting forth the HUBZone status protest procedures). GEO contended that Dorado could not have satisfied the HUBZone program's 35% employee residency requirement on either the date it submitted its offer or the date of the award. AR Tab 18 at 471–74.

## III.    SBA's Request for Documentation and Dorado's Response

On November 17, 2015, SBA requested that Dorado submit documentation to establish that it met the 35% residency requirement on both the date of its offer and the date of award. Id. Tab 19 at 520–23. Among other things, it requested "company payroll records for Dorado showing all employees and number of hours worked per week at the time Dorado submitted its offer and at the time of award." Id. at 521 (footnote omitted). For "employees who worked less than 40 hours during the week when the offer was submitted or during the week of award," SBA asked Dorado to:

> [P]rovide the following to demonstrate that those employees worked at least 40 hours in a month as of the date of offer and the time of award:
>
> o payroll records that cover the four-week period leading up to, and ending on the date of offer, and
>
> o payroll records that cover the four-week period leading up to, and ending on the date of award.

---

[2] GEO's protest included a size protest as well. See AR Tab 18 at 469–70. That portion of the protest is not relevant to this case.

Id. SBA also requested that Dorado provide "records indicating the home address of each HUBZone resident employee of Dorado at the time offers were submitted and at the time of award, including copies of driver's licenses or voter registration cards showing that the employee's home address is in a HUBZone." Id. at 522. It further instructed Dorado to provide "a copy of a HUBZone map determination for each employee residing in a HUBZone, including the name of each employee on the HUBZone maps," as well as "an explanation and any other documents addressing the specific allegations set forth in the protest." Id.

Dorado responded on November 24, 2015. Id. Tab 45. It claimed that it employed 82 people on both the date of the offer and at the time of the award; and that 31 of those employees lived in HUBZones on the date of the offer, while 32 lived in HUBZones at the time of the award.[3] Id. at 1849–51. Dorado also provided supporting documentation, including payroll information and proofs of residence, for each claimed HUBZone-resident employee. Id. Tabs 46–69. For 28 of its claimed HUBZone-resident employees, Dorado used driver's licenses as proofs of residence. See id. Tabs 48–63. For the other four—[ . . . ], [ . . . ], [ . . . ], and [ . . . ]—Dorado provided other forms of documentation that it believed were responsive to SBA's request.[4] See id. Tabs 54, 61, 63, 69.

## IV.    SBA's Decision and Dorado's First Administrative Appeal

On December 16, 2015, the Director of the HUBZone program (D/HUB) sustained the protest against Dorado. Id. Tab 30. After assessing Dorado's supporting documentation, she found that Dorado had 73 employees at the time of the offer, 26 of whom lived in HUBZones. Id. at 1473. Thus, at the time of the offer, 35.6% of Dorado's employees lived in HUBZones. See id. Further, she found that Dorado had 56 employees on the date of the award, of whom just five lived in HUBZones. Id. Thus, the D/HUB determined that on the date of the award, only 8.93% of Dorado's employees lived in HUBZones. See id. According to the D/HUB, "Dorado did not provide the acceptable forms of documentation to establish HUBZone residency for all employees identified as HUBZone residents," and, "[a]dditionally, redesignation resulted in some locations no longer being qualified HUBZones."[5] Id. n.2. However, she provided no specifics about which employees lacked documentation or which resided in redesignated locations. See id. Based on Dorado's failure to meet the 35% residency requirement at the time of the

---

[3] In its response, Dorado listed one employee—[ . . . ]—twice, giving two different addresses. See AR Tab 45 at 1850–51. Nevertheless, Dorado apparently counted him only once toward its total number of HUBZone-resident employees. See id.

[4] The specifics of these other forms of documentation are discussed in more detail below.

[5] As discussed in more detail below, when certain areas no longer qualify as HUBZones because of change conditions, they do not immediately lose their HUBZone status. Instead, they become "redesignated" HUBZone areas for a three-year period. See 15 U.S.C. § 632(p)(4)(C). When the three-year period ends, a redesignated area then loses its HUBZone status. See id. § 632(p)(1).

award, the D/HUB determined that Dorado was "ineligible for this award, ineligible for the HUBZone program, and will be decertified immediately." Id. at 1471. Further, her determination was "effective immediately and is final unless overturned on appeal" Id.

On December 23, 2015, Dorado appealed the decision to SBA's Associate Administrator for Government Contracting and Business Development (AA/GCBD). Id. Tab 32. The AA/GCBD sustained Dorado's appeal and vacated the D/HUB's decision on February 8, 2016. Id. Tab 35. According to the AA/GCBD, the D/HUB failed to "reasonably explain why [she] found Dorado to have 26 fewer employees than [it] claimed" on the date of the award. Id. at 1528–29. The AA/GCBD also found that "SBA's record [was] not complete" because it did not contain "all the records collected, and all the records created by SBA during the protest process prior to the decision." Id. at 1528. The AA/GCBD thus remanded the matter to the D/HUB, instructing her to ensure that "all documents and information received are in the file"; that "all SBA created material be in the file as well"; and that her "analysis and reasoning for determining who is and who is not [an] employee, and who is and who is not a HUBZone resident is documented and recorded in the file." Id. at 1529.

## V.       SBA's Decision on Remand and Dorado's Second Administrative Appeal

In April 2016, while the administrative remand remained pending, Dorado began performing the contract, apparently at the direction of the Air Force. Compl. ¶ 15. On May 3, 2016, the D/HUB issued her remand decision. Id. Tab 37. She again concluded that the protest against Dorado should be sustained. Id. at 1567. This time, however, she found that Dorado failed to comply with the 35% residency requirement both on the date of the offer and at the time of the award. See id.

First, the D/HUB again determined that Dorado had 73 employees at the time of the offer. Id. at 1569. She noted that Dorado provided evidence of HUBZone residency for 32 employees, but found that the supporting documentation for five of the employees—[ . . . ], [ . . . ], [ . . . ], [ . . . ], and [ . . . ]—was not acceptable. See id. Without further explanation, the D/HUB then concluded that Dorado had "25 employees residing in a HUBZone at that time." Id. at 1570. Using that figure, the D/HUB determined that Dorado did not meet the 35% residency requirement at the time of the offer. Id.

Next, the D/HUB again determined that, at the time of the award, Dorado had 56 employees, of whom just five lived in HUBZones. Id. The D/HUB did not identify by name the 56 individual employees or the five employees whom she determined were HUBZone residents. See id. Instead, after noting that "[t]hirty-two employees were asserted to be HUBZone residents" she stated that three of Dorado's claimed HUBZone-resident employees were "excluded in determination of HUBZone residency based on inadequate documentation."[6] Id. Eight more claimed HUBZone-resident employees were

---

[6] These three employees were [ . . . ], [ . . . ], and [ . . . ]. AR Tab 37 at 1570.

"excluded in determination of HUBZone residency" because their addresses' HUBZone designations had expired on October 1, 2015.[7] Id.

Further, according to the D/HUB, 13 of Dorado's claimed HUBZone-resident employees "were not listed on the payroll at the time of award," and thus "were not counted toward [the] residency requirement."[8] Id. The D/HUB also listed 50 individuals for whom "neither corroborative documentation nor HUBZones maps were submitted," and noted that "these employees were not counted toward the 35% residency requirement." Id. at 1570–71. Without further explanation, the D/HUB then concluded that "[b]ecause only five employees were found to have resided in a HUBZone, this requirement was not met at the time of award." Id. at 1571.

Dorado again appealed the D/HUB's decision. Id. Tab 39. On June 15, 2016, the AA/GCBD affirmed the D/HUB's second decision. Id. Tab 41. With respect to the time of the award, he first noted that the D/HUB "reviewed several weeks of Dorado's payroll records" to determine that Dorado had 56 employees on October 29, 2015. Id. at 1607. He then listed the 56 employees' names. Id. The list included eight employees that Dorado had claimed as HUBZone residents—[ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], and [ . . . ]. See id.

After reviewing the documentation in the record, the AA/GCBD determined that the D/HUB failed to include one non-HUBZone resident, Julius Nichols, in the list of Dorado's employees at the time of the award. See id. The AA/GCBD thus concluded that Dorado had 57 employees at the time of the award. Id. He also concluded that the D/HUB did not err in excluding Charlie Knight, John Davis, and Natonia Mills from the list of HUBZone-resident employees. Id. at 1607–08. Accordingly, he determined that Dorado did not meet the 35% residency requirement at the time of the award, as just five out of its 57 employees (or 8.77%) met the HUBZone residency requirements on that date. Id. at 1608.

The AA/GCBD next addressed Dorado's argument that the D/HUB erred by excluding the 13 claimed HUBZone-resident employees that the D/HUB determined were "not listed on the payroll at the time of award." See id. Tab 37 at 1570. According to the AA/GCBD, Dorado's records "demonstrate[d] that an additional 24 individuals, including the 13 [mentioned] above, worked for Dorado" during the relevant period. Id. Tab 41 at 1608. However, the AA/GCBD concluded that he "[did] not believe [that the D/HUB] erred by excluding these 24 individuals as employees of Dorado at the time of award because these individuals did not work a minimum of 40 hours prior to and including the date of award." Id. (emphasis in original). In other words, the AA/GCBD

[7] These eight employees were [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], and [ . . . ]. AR Tab 37 at 1570.

[8] These thirteen employees were [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], two separate individuals named [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], and [ . . . ]. AR Tab 37 at 1570.

agreed that these 24 individuals could not be counted as employees on the date of the award because they did not appear on the payroll records which covered the pay period during which the award was made.

In the alternative, the AA/GCBD found that even if the 24 additional individuals were included as employees, Dorado had not met its burden of establishing that 35% of its employees were HUBZone residents at the time of the award. See id. According to the AA/GCBD, "Dorado submitted adequate HUBZone residency documentation for 15 of these 24 excluded individuals."[9] Id. On the other hand, he found the documentation for one of the individuals unacceptable because Dorado had submitted "an expired lease . . . . [w]ithout corroborative documentation." Id. Further, he excluded eight other employees because "they reside[d] in areas that ceased to be qualified HUBZone areas on October 1, 2015" because the areas had been redesignated. Id.

The AA/GCBD thus concluded that even if Dorado did have 81 employees as of the date of the award, at most 23 were HUBZone residents.[10] Id. at 1609. Accordingly, the AA/GCBD found that even under this alternative analysis, Dorado did not meet the 35% residency requirement. Id.

Finally, the AA/GCBD determined that because "Dorado was not an eligible HUBZone small business concern at the time of award, it is not necessary to evaluate compliance at the time of offer." Id. He therefore affirmed the D/HUB's second decision. Id.

## VI.     This Action

Nearly two months after the AA/GCBD's second decision, on August 4, 2016, Dorado filed its complaint in this Court, along with a motion for a preliminary injunction. See Compl.; Pl.'s Mot. for Prelim. Inj. Relief, ECF No. 5. Dorado alleged that SBA's "determination that Dorado is not a HUBZone SBC" and its subsequent decertification of Dorado was arbitrary, capricious, and contrary to law. Compl. ¶ 1.

The Court held a status conference with the parties on August 8, 2016. See ECF No. 14. Based upon the government's agreement to allow Dorado to continue to perform on the contract until September 30, 2016, the Court set up an expedited briefing schedule under which the Court would treat Dorado's motion for a preliminary injunction as a motion for judgment on the administrative record. See id. After compiling the administrative record, the government filed a motion to dismiss the case for lack of

---

[9] Specifically, he determined that Dorado submitted adequate documentation for [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], the two individuals named [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], and [ . . . ]. AR Tab 41 at 1608.

[10] The AA/GCBD included [ . . . ], [ . . . ], [ . . . ], as HUBZone residents in this calculation, but not [ . . . ]. See AR Tab 41 at 1608.

subject matter jurisdiction. ECF No. 19. It then filed its cross-motion for judgment on the administrative record. ECF No. 28.

After holding oral argument on the government's motion to dismiss, the Court denied that motion on August 26, 2016. See Order Denying Mot. to Dismiss, ECF No. 29. Dorado then filed its response to the government's cross-motion along with a motion to supplement the administrative record. ECF Nos. 30–31. Shortly before oral argument, the Court requested supplemental submissions from the parties explaining their respective calculations regarding the number of individuals employed by Dorado at the time of the award. ECF No. 36. On September 21, 2016, the Court held oral argument on the cross-motions for judgment on the administrative record. The outstanding motions are now ripe for decision.

## DISCUSSION

### I.      Jurisdiction

The Court of Federal Claims' bid protest jurisdiction is defined by 28 U.S.C. § 1491(b)(1). That statute grants the Court jurisdiction to "render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Id. As the Federal Circuit has observed, "[o]n its face, the statute grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement." Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (2012).

As indicated by the statute, a plaintiff must be an "interested party" to have standing to invoke the Court's bid protest jurisdiction. CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015); Myers Investigative and Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002). According to the Federal Circuit, an "interested party" under 28 U.S.C. § 1491(b)(1) is "an actual or prospective bidder . . . whose direct economic interest would be affected by the award of the contract." CGI Fed., 779 F.3d at 1348 (quoting Am. Fed'n of Gov't Employees, AFL-CIO v. United States, 258 F.3d 1294, 1299 (Fed. Cir. 2001); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). An offeror has a direct economic interest if the alleged errors in the procurement caused it to suffer a competitive injury or prejudice. Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370 (holding that "prejudice (or injury) is a necessary element of standing").

The government moved to dismiss this bid protest on August 12, 2016, arguing that Dorado cannot invoke the court's bid protest jurisdiction because there exists a "bright-line rule that a Government contractor that has been performing under a contract lacks bid protest standing to raise a challenge related to that contract." Def.'s Mot. to Dismiss for Lack of Subject-Matter Jurisdiction (Def.'s Mot. to Dismiss) at 7, ECF No. 19; see also Def.'s Reply to Pl.'s Opp'n to [its] Mot. to Dismiss for Lack of Subject-Matter Jurisdiction at 5–6, ECF No. 26. According to the government, once a contractor

begins performing, any alleged violations of law that occur or have already occurred cannot be violations "in connection" with a procurement within the meaning of 28 U.S.C. § 1491(b)(1) because the "acquisition process" has been completed. Def.'s Mot to Dismiss at 7–8. As the Court explained in its Order denying the government's motion to dismiss, and as more fully set forth below, the government's objections to this Court's exercise of its bid protest jurisdiction lack merit.

First, the violations of law alleged by Dorado—which concern Dorado's eligibility to bid on and receive a contract award that was limited to HUBZone-certified entities—were committed by SBA, and not by the Air Force. For that reason, the focus of Dorado's complaint is not on the Air Force's administration of its contract with Dorado, but rather on SBA's determination to decertify Dorado. SBA's determination occurred in connection with a protest filed by one of Dorado's competitors on the solicitation. In this context, such a decertification is clearly a governmental action in connection with a procurement. RCD Cleaning Serv., Inc. v. United States, 97 Fed. Cl. 582, 587 (2011). Indeed, "a bid protest challenging SBA's decertification of an awardee from the HUBZone program fits squarely within this court's bid protest jurisdiction." Id.; see also Aeolus Sys., LLC v. United States, 79 Fed. Cl. 1, 6–7 (2007) (asserting bid protest jurisdiction over challenge to SBA determination that plaintiff was not a qualified HUBZone small business concern, which led to cancellation of a contract awarded to plaintiff).

Further, the rules that governed SBA's determination relate only to matters of procurement, and not to matters of contract administration. Thus, as dictated by SBA's regulations, the HUBZone protest was filed by one of Dorado's competitors shortly after the award was made to Dorado and months before the Air Force decided to allow Dorado to begin performance on the contract. See 13 C.F.R. §§ 126.800–01. As spelled out in the regulations, the material facts for purposes of SBA's decision concern whether Dorado met the HUBZone residency requirements at two critical points in the acquisition process: the date of Dorado's offer and the date of the award. See id. §§ 126.200(b)(4), 126.601(c). The decertification decision thus had nothing whatsoever to do with Dorado's performance on the contract, and the fact that contract performance had begun in the interim was a matter of happenstance. Indeed, as the HUBZone regulations governing status protests confirm, "SBA does not review issues concerning the administration of a HUBZone contract." Id. § 126.801(a). For these reasons, as the court noted in RCD Cleaning Serv., any argument that a dispute involving SBA's decertification of a contract awardee involves a matter of contract administration "strains credulity." 97 Fed. Cl. at 587.

Further, the government's promotion of a "bright line" rule which excludes plaintiffs from invoking this Court's bid protest jurisdiction once an award has been made and performance begun is inconsistent with the Federal Circuit's observation that, "a narrow application of section 1491(b)(1) does not comport with the statute's broad grant of jurisdiction over objections to the procurement process." Sys. Applications & Techs., Inc., 691 F.3d at 1381; see also RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (describing the text of the jurisdictional grant as "very sweeping in scope"). There is nothing in the statute that categorically excludes awardees

who have begun performance from invoking this Court's bid protest jurisdiction. Indeed, the court of appeals recently eschewed such a formulaic approach to whether a plaintiff has properly invoked the court's bid protest jurisdiction in <u>Sys. Applications & Techs., Inc.</u> <u>See</u> 691 F.3d at 1381–82. There, the court of appeals noted that the fact that the plaintiff was a contract awardee was not "material to the question of jurisdiction," and that the plaintiff's "attempt to enjoin the government from terminating its contract did not transform its otherwise proper protest under the Tucker Act into a claim which could only be adjudicated under the Contract Disputes Act and its concomitant procedural requirements." 691 F.3d at 1381-82; <u>see also</u> <u>Nat'l Air Cargo Grp., Inc. v. United States</u>, 126 Fed. Cl. 281, 289–91 (2016) (rejecting argument that "contract awardees are categorically barred from filing bid protests").

Thus, the Court agrees with Judge Lettow's observation in <u>Nat'l Air Cargo</u> that the key question for purposes of whether a claim is within this Court's bid protest jurisdiction (or is instead subject exclusively to the Contract Disputes Act) is not whether performance has begun. Rather, the critical question is whether a plaintiff's claims concern violations of procurement law or whether, instead, they involve issues of contract administration. <u>See</u> 126 Fed. Cl. at 290 (observing that a bid protest claim "does not allege violations of contract law, but instead alleges violations of procurement law"); <u>see also</u> <u>Ingersoll–Rand Co. v. United States</u>, 780 F.2d 74, 77–78 (D.C. Cir. 1985) (to decide whether a protester has alleged a violation of law in connection with a procurement, the court must examine the particular facts of the case to determine whether the "[s]ource of the [r]ight at [s]take" is one that "sounds genuinely in contract or is based on truly independent legal grounds" (quotation and alteration omitted)). In this case, the source of the right at issue is SBA's regulations governing HUBZone status, and not the contract between Dorado and the Air Force.

The government cites <u>ITility, LLC v. United States</u>, 124 Fed. Cl. 452, 458 (2015) in support of its categorical argument that no claim brought by a contractor that has already begun performance can be related to a procurement for purposes of 28 U.S.C. § 1491(b). <u>See</u> Def.'s Mot. to Dismiss at 8. But the government reads <u>ITility</u> too broadly. That case involved a contractor's challenge to a negative performance assessment, which the contractor argued might impact its chances of securing future contract awards. <u>See</u> 125 Fed. Cl. at 457. The court there held that the contractor had not brought itself within the court's bid protest jurisdiction because its complaint "concern[ed] <u>the administration of [a] contract[] [it] ha[d] been awarded and performing.</u>" <u>Id.</u> at 458 (emphasis added). Here, for the reasons set forth above, SBA's decision had nothing to do with the administration of Dorado's contract or a future procurement. Instead, SBA's decision concerned whether Dorado was eligible to be awarded the contract it was then performing. Thus, the government's reliance on <u>ITility</u> is misplaced.

For similar reasons, the Court rejects the government's categorical argument that Dorado cannot be an "interested party" for purposes of section 1491(b) because it has already begun performing on the contract. As the Federal Circuit has observed, "a protest will, by its nature, dictate the necessary factors" for determining whether the protester is an "interested party" with standing to bring a bid protest. <u>Sys. Applications & Techs., Inc.</u>, 691 F.3d at 1382. In this case, Dorado was an actual offeror on the contract.

Dorado's standing thus "hinges upon whether the [SBA's] decision gives rise to a 'non-trivial competitive injury which can be addressed by judicial relief.'" Id. (quoting Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1362 (Fed. Cir. 2009)).

It is clear that SBA's decertification decision did give rise to a non-trivial competitive injury which could be addressed by judicial relief. Specifically, SBA's decision has disqualified Dorado from being eligible to receive the award it secured in connection with the original solicitation. As a result, Dorado's competitor, which had pursued the original protest with SBA, stands to receive the award in Dorado's place. See Transcript of Oral Argument on Mot. to Dismiss at 8:15–18 (Aug. 25, 2016) (counsel for the government confirming, in response to the Court's questioning, that "what's happening here is GEO is now getting the contract because of the SBA's decision"). Thus, Dorado has alleged that it suffered a competitive injury and has standing to bring this action under 28 U.S.C. § 1491(b)(1). See RCD Cleaning Serv., 97 Fed. Cl. at 587 (observing that plaintiff had standing to file a bid protest where "[it] was awarded the contract, and, but for SBA's decertification decision, had a substantial chance of performing the contract").

In short, the Court sees no reason to treat the moment performance begins as a bright line separating a claim under the Contract Disputes Act from a claim under 28 U.S.C. § 1491(b)(1). Therefore, the Court concludes that Dorado is an interested party with standing to bring this case under the Court's bid protest jurisdiction.

## II.     The Parties' Cross-Motions for Judgment on the Administrative Record and Dorado's Motion to Supplement the Administrative Record

### A.     Standard for Granting Judgment on the Administrative Record

Pursuant to Rules of the Court of Federal Claims (RCFC) 52.1, the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005). The Court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

### B.     Standard of Review in Bid Protest Cases

The court reviews challenges to a procurement decision under the same standards used to evaluate an agency action under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section

706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351. This "highly deferential" standard "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

In a bid protest action, the protester "bears a heavy burden" in attempting to show that [the] agency's decision lacked a rational basis, and the court's function is limited to "determin[ing] whether 'the . . . agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33, 1338 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). Thus, to prevail, the agency need only articulate a "rational connection between the facts found and the choice made;" and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (quotations omitted).

Further, even if it can demonstrate that the agency erred, the protestor must also show that it has been prejudiced by the agency's errors. See Bannum, Inc., 404 F.3d at 1351 ("[I]f the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 698 (2010) (observing that, to ultimately prevail in a bid protest, the protester "must show that it would have had a substantial chance of being awarded the contract but for the combined impact of any agency decisions adjudged to be unlawful" (emphasis in original)).

**C.    The AA/GCBD's Decision in This Case**

**1.    The AA/GCBD's Determination Regarding the Number of Employees Dorado Had at the Time of the Award**

In response to the HUBZone status protest, Dorado claimed that it had 82 employees within the meaning of the HUBZone regulations at the time of the award. See AR Tab 45 at 1849; id. Tab 46 at 1859. However, the AA/GCBD determined that Dorado had just 57 employees who worked "a minimum of 40 hours prior to and including the date of [the] award." Id. Tab 41 at 1608 (emphasis in original).

Under the HUBZone regulations, "employee" means "all individuals employed on a full-time, part-time, or other basis, so long as that individual works a minimum of 40 hours per month." 13 C.F.R. § 126.103. To determine whether an individual is an employee, SBA considers "the totality of the circumstances, including criteria used by the IRS for Federal income tax purposes and those set forth in SBA's Size Policy Statement No. 1." Id.

As discussed above, to corroborate its claim that it had 82 employees at the time of the award, SBA asked Dorado to submit "company payroll records for Dorado showing all employees and number of hours worked per week . . . at the time of [the] award." AR Tab 19 at 521. Further, "if there were any employees who worked less than 40 hours during . . . during the week of [the] award," SBA instructed Dorado to provide "payroll records that cover the four-week period leading up to, and ending on the date of [the] award" to "demonstrate that those employees worked at least 40 hours in a month as of . . . the time of [the[ award." Id. SBA specified that the payroll records "must show at a minimum the employee's name, number of hours worked for that pay period, and pay period beginning and end dates." Id. n.1. Further, Dorado was to "indicate the number of hours worked per week for every individual on the payroll, including those that are salaried and show no specific number of hours worked." Finally, SBA also instructed Dorado to provide "a statement explaining whether all individuals that work for Dorado are shown as employees on the payroll." Id.

As the government explained in its supplemental submission, SBA used a two-step process to determine that Dorado had 57 employees at the time of the award (i.e., on October 29, 2015). See Def.'s Submissions in Resp. to the Court's O. of Sept. 16, 2016 (Def.'s Suppl. Submission) at 2–5, ECF No. 43. First, it examined Dorado's payroll records for the pay period ending October 31, 2015. Id. at 4. It then included only the names of employees listed on those payroll records in the pool of possible employees at the time of the award. Id. SBA eliminated 24 individuals in this step, yielding a tally of 58 possible employees. See id.

Next, SBA looked at all the payroll records Dorado submitted covering the month of October 2015 to determine whether each of those 58 employees worked a combined total of at least 40 hours during those pay periods. See id. The AA/GCBD eliminated only one employee from the pool in this second step.[11] See id.; see also AR Tab 41 at 1607.

Dorado argues that SBA's decision to not consider as an "employee" any individual whose name did not appear on the payroll for the pay period ending October 31, 2015 was "inconsistent with the HUBZone regulations." Pl.'s Resp. in Opp'n to the Government's Cross-Mot. for J. on the Admin. R. and Reply in Supp. of its Mot. for J. on the Admin. R. (Pl.'s Resp.) at 20, ECF No. 30. According to Dorado, the regulations contemplate that "anyone who works at least 40 hours in a given month for a firm count as an employee of that firm for that month," regardless of which payroll pay periods include their names. Id. at 21.

The Court, however, need not address Dorado's argument that SBA arbitrarily excluded from its count of employees those individuals who did not appear on Dorado's

---

[11] In its supplemental submission, the government states that the elimination of this individual "appears to have been inadvertent." See Def.'s Suppl. Submission at 4 n.1. As discussed below, however, this inadvertent elimination has no impact on the outcome of the case.

payroll for the pay period ending October 31, 2015. It need not be addressed because, as discussed above, the AA/GCBD also provided an alternative rationale for his ultimate determination that Dorado failed to comply with the 35% residency requirement. See AR Tab 41 at 1608. Thus, the AA/GCBD determined that "even if [the D/HUB] had included these 24 individuals as employees at the time of award"—i.e., the 24 individuals excluded at the first step of the process—"Dorado would still not meet the 35% HUBZone residency requirement." Id.

As discussed below, the AA/GCBD's alternative rationale provides a sufficient basis for resolving Dorado's challenge. Accordingly, for purposes of deciding this case, the Court will treat as employees all 82 individuals who worked a total of at least 40 hours during the pay periods covering October 2015 for which Dorado produced payroll records in response to the protest. Thus, the Court now turns to assessing whether the AA/GCBD erred under the alternative rationale.[12]

2.      **The AA/GCBD's Determination Regarding the Number of HUBZone-Resident Employees Working for Dorado at the Time of the Award**

In response to the HUBZone protest, Dorado claimed that 32 of its employees resided in HUBZones at the time of the award. See AR Tab 45 at 1850–51; see also id. Tab 46 at 1859 (chart listing Dorado's claimed HUBZone-resident employees). Under the program's regulations, "reside" means "to live in a primary residence at a place for at least 180 days, or as a currently registered voter, and with intent to live there indefinitely." 13 C.F.R. § 126.103. As mentioned above, in its request for corroborative

─────────────────────

[12] The Court notes that Dorado moved to supplement the administrative record in this case to include payroll records for the pay period ending November 7, 2015 as well as a letter that Dorado received from the SBA in 2010 proposing to decertify Dorado from the HUBZone program under prior regulations. See Dorado's Mot. to Suppl. the Admin. R., ECF No. 31. It appears that Dorado would have the Court consider these documents in support of its argument that the SBA's determination of the number of employees it had on board at the time of the award was incorrect. But Dorado did not provide these documents to the SBA in connection with this matter and the SBA did not consider them. The Federal Circuit has made clear that the "focal point" of the Court's review of an agency's procurement decision "should be the administrative record already in existence, not some new record initially made in the reviewing court." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). Accordingly, a court should not allow supplementation of the administrative record unless "the omission of extra-record evidence precludes effective judicial review" of the agency's decision. Id. (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (Fed. Cl. 2000)). In this case, Dorado does not argue that the Court cannot effectively review the SBA's decision unless it considers these documents. Dorado's motion to supplement the administrative record is therefore DENIED.

documentation, SBA asked for documentation including "but . . . not limited to" the following:

- [R]ecords indicating the home address of each HUBZone resident employee of Dorado . . . including copies of driver's licenses or voter registration cards showing that the employee's home address is in a HUBZone . . .

- [A] copy of a HUBZone map determination for each employee residing in a HUBZone, including the name of each employee on the HUBZone maps; [and] . . .

- [A]n explanation and any other documents addressing the specific allegations set forth in the protest.

AR Tab 19 at 522. SBA noted that "after reviewing the documents requested and received, the program office may have further requests for additional documents or clarification of information." Id. at 522. "Further," it continued, "signed declarations bear greater weight than mere statements." Id.

Based on the documents Dorado provided, the AA/GCBD ultimately determined that Dorado submitted adequate documentation to establish HUBZone residency for 20 of the 32 individuals it claimed as HUBZone-resident employees. See id. Tab 41 at 1607–08. On the other hand, he determined that Dorado did not submit adequate documentation to establish HUBZone residency for the following 12 individuals:

| 1. | [ . . . ] | 7. | [ . . . ] |
|---|---|---|---|
| 2. | [ . . . ] | 8. | [ . . . ] |
| 3. | [ . . . ] | 9. | [ . . . ] |
| 4. | [ . . . ] | 10. | [ . . . ] |
| 5. | [ . . . ] | 11. | [ . . . ] |
| 6. | [ . . . ] | 12. | [ . . . ] |

See id. The AA/GCBD determined that four of these individuals—[ . . . ], [ . . . ], [ . . . ], and [ . . . ]—lacked adequate proof of their places of residence. See id. As for the other eight—[ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], [ . . . ], and [ . . . ]—the AA/GCBD determined that although Dorado had produced adequate proofs of residence, the areas in which these individuals resided had "ceased to be qualified HUBZone areas on October 1, 2015." See id. at 1608–09.

### a.     The Eight Individuals With Adequate Proofs of Residence

SBA's treatment of the latter eight individuals is of paramount importance in this case. As Dorado conceded at oral argument, it cannot meet the 35% residency requirement if these eight individuals are not counted as HUBZone residents. See Oral Argument on Cross-Mots. for J. on the Admin. R. at 4:30–41 (September 21, 2016).

Thus, if these eight individuals are not counted as HUBZone-residents, Dorado could claim at most 24 HUBZone-resident employees out of 82 total employees, or 29.3%.

The statutory scheme establishes several criteria for determining the boundaries of a HUBZone. See 15 U.S.C. § 632(p)(4). Under the first criterion, any census tract that the Department of Housing and Urban Development (HUD) has determined is a qualified census tract for purposes of the low-income housing credit is also a HUBZone. See id. § 632(p)(4)(A) (incorporating by reference the definition found in 26 U.S.C. § 42(d)(5)(B)(ii)). In addition, when a formerly qualified census tract "ceases to be qualified" (as determined by HUD), it becomes a "redesignated area" for a three-year period. See 15 U.S.C. § 632(p)(4)(C). Redesignated areas are also HUBZones. Id. § 632(p)(1)(D). Thus, as the government observes, redesignation acts as "a form of grandfathering" giving businesses a chance to "endeavor to remain certified" after a census tract where its employees reside otherwise ceases to be a qualified HUBZone. See Def.'s Reply to Pl's Opp'n to Def.'s Cross-Mot. for J. on the Admin. R. (Def.'s Reply) at 3.

All eight of the individuals identified above resided in a single census tract—No. 12117020201. See AR Tab 48 at 1920 ([ . . . ]); id. Tab 49 at 1924 ([ . . . ]); id. at 1927 ([ . . . ]); id. Tab 50 at 1931([ . . . ]); id. at 1934 ([ . . . ]); id. Tab 51 at 1938 ([ . . . ]); id. Tab 53 at 1952 ([ . . . ]); id. at 1955 ([ . . . ]). According to the AA/GCBD, that census tract ceased to be a "qualified census tract" on October 1, 2012, and thus became a redesignated area on that date. See AR Tab 41 at 1608 n.1. The redesignation then expired three years later, on October 1, 2015. See id. Thus, on the date of the award, the census tract where the eight employees lived was not a HUBZone.

Nevertheless, Dorado argues that the employees should be considered HUBZone residents based on the contents of certain HUBZone maps it accessed on SBA's website on November 17, 2015. See Pl.'s Resp. at 23–24. According to Dorado, those maps contained language suggesting that the relevant tract was still a HUBZone as of that date. See id.

A review of the maps shows that they contain textual information that—at least beginning October 1, 2015—was somewhat contradictory. On the one hand, the text below each map states that each address "is in [a] previously Qualified Census Tract . . . whose status is: Redesignated until Oct. 2015," and that each address "will be Redesignated until October 1, 2015." E.g., AR Tab 50 at 1931 (map for Abigail Leal's address). On the other, the text below each map apparently continued to include the statement "YES, this location is HUBZone Qualified" even after October 1, 2015. See id.

Even assuming that there was some evidence in the record that Dorado was somehow confused by this language, Dorado's confusion does not provide a sufficient basis for counting the eight employees as HUBZone residents at the time of the award. Most importantly, SBA itself "does not have discretion when it comes to designating HUBZones." See HUBZone Program: Frequently Asked Questions, SBA.gov, https://www.sba.gov/contracting/government-contracting-programs/hubzone-program/frequently-asked-questions#designations (last visited September 29, 2016).

Rather, "[t]he HUBZone areas are designated by statute and draw upon determinations and information obtained by other agencies." Id. And SBA's role in determining a HUBZone under 15 U.S.C. § 632(p)(4)(A) is particularly limited, as HUD, not SBA, determines which census tracts are "qualified" census tracts and annually publishes that data on its website.[13] See Qualified Census Tract Table Generator, HUD.gov, http://qct.huduser.gov/index.html (last visited September 29, 2016); see also 80 Fed. Reg. 73201, 73204–05 (Nov. 24, 2015) (describing methodology). Thus, the text under the maps constitutes, at best, an unofficial characterization of the census tract's HUBZone status; it has no bearing on whether that census tract is, in fact, a HUBZone.[14]

Even leaving that aside, the record fails to support Dorado's apparent argument that it placed reliance on the text under the maps to its detriment. As Dorado itself noted at oral argument, a contractor cannot predict in advance when an agency will decide to make an award. See Oral Argument on Cross-Mots. for J. on the Admin. R. at 6:10–26. So a contractor attempting to ensure in advance that it would comply with the 35% residency requirement would logically check on its employees' residency status before submitting its offer and thereafter. Had Dorado done so here (and assuming the maps included the same text at that time), then the text would have put Dorado on notice that the eight employees would no longer live in a HUBZone as of October 1, 2015. This, in turn, would have given Dorado an opportunity to plan its hiring accordingly.

Further, the HUBZone regulations require Dorado to recertify its HUBZone status every three years. 13 C.F.R. § 126.500. At oral argument, counsel for Dorado indicated that the company last recertified sometime in 2015. Oral Argument on Cross-Mots. for J. on the Admin. R. at 1:11:10–21. And counsel for Dorado also repeatedly described the company as "meticulous" about ensuring its HUBZone status. Id. at 5:58–6:02; 6:35–47. Thus, Dorado would have been aware of this looming issue since at least the time of its recertification (or the time when it hired the eight employees, if it hired them after the recertification), which would have given it even more time to adjust its workforce mix.

---

[13] SBA arguably has a more involved role in determining whether certain counties are "qualified nonmetropolitan counties" under 15 U.S.C. § 632(p)(4)(B), as the statute appears to task SBA with making some of those determinations based on data compiled by other agencies. See id. § 632(p)(4)(B)(ii)(I)–(II). As mentioned, however, the eight relevant employees all resided in an area that had been a HUBZone by dint of its status as a qualified census tract under § 632(p)(4)(A), rather than a qualified nonmetropolitan county under § 632(p)(4)(B).

[14] To the extent that Dorado is arguing that the language beneath the map should be used as a basis for estopping the government from denying that certain employees lived in HUBZones at the time of the award, that argument lacks merit. See Wood v. Office of Personnel Mgmt., 241 F.3d 1364, 1367 (2001) ("[T]he government is not generally subject to estoppel or a waiver of restrictions on eligibility for benefits even when the applicant is given misleading information that results in prejudicing his efforts to obtain the benefits." (citing Office of Personnel Mgmt. v. Richmond, 496 U.S. 414, 433 (1990))).

And, at least with respect to the eight relevant employees, Dorado's argument that "there is no other way for a firm like Dorado to ensure that it is meeting the HUBZone residency [requirement], other than to rely on the SBA's HUBZone maps," see Pl.'s Resp. at 24, is belied by the availability of census tract information on HUD's website.

In the end, the Court concludes that a company that scrupulously tracked its HUBZone status (as Dorado claims it did) had no reason to be and in fact was not caught off-guard by the expiration of the redesignated area where eight of its employees lived. Thus, the AA/GCBD properly excluded the eight employees from Dorado's list of HUBZone-resident employees. As Dorado concedes, it cannot meet the 35% residency requirement without those eight employees. Accordingly, even if the AA/GCBD erred in some other respect, Dorado was not prejudiced by such error; and Dorado's motion for judgment on the administrative record must therefore be **DENIED**.

### b.      The Four Individuals Without Adequate Documentation

Although not necessary to the Court's resolution of this case, the Court briefly addresses the parties' arguments concerning the four individuals whose documentation SBA considered insufficient to establish their HUBZone residency. For one of these individuals—[ . . . ]—Dorado submitted only an expired lease. See AR Tab 63 at 2028. Dorado does not appear to challenge [ . . . ]'s exclusion. See Pl.'s Mem. of P. & A. in Supp. of its Mot. for Prelim. Inj. Relief (Pl.'s Mem.) at 7–8, ECF No. 6; Pl.'s Resp. at 17–18.

For the other three individuals—[ . . . ], [ . . . ], and [ . . . ]—Dorado submitted a combination of documents. For [ . . . ] and [ . . . ], it submitted current utility bills. See AR Tab 54 at 1961; id. Tab 61 at 2014. For [ . . . ], it submitted a partial copy of a vehicle title. Id. Tab 54 at 1964. In addition, Dorado submitted a declaration from its Vice President for Operations, [ . . . ], in which he attested that [ . . . ], [ . . . ], and [ . . . ] all resided at the addresses indicated in their documentation. Id. Tab 69 at 2306–07. Further, as an exhibit to this declaration, Dorado included a screenshot of an electronic voter registration webpage for [ . . . ]. Id. at 2317. Dorado apparently submitted [ . . . ]'s declaration in response to a sentence in SBA's November 17, 2015 request for documentation, which stated that "signed declarations bear greater weight than mere statements." See id. Tab 19 at 522; Oral Argument on Cross-Mots. for J. on the Admin. R. at 25:16–36.

Dorado first argues that the AA/GCBD "ignore[d]" the documentation it submitted. Pl.'s Mem. at 7. The Court finds this argument unpersuasive, as both the D/HUB and the AA/GCBD mentioned the specific documentation in their decisions. See AR Tab 37 at 1569; id. Tab 41 at 1608. The agency also did not err by discounting the value of [ . . . ]'s declaration. As the government points out, [ . . . ] lacked personal knowledge of the places where the employees lived and whether they intended to remain there indefinitely. See Def.'s Opp'n to Pl.'s Mot. for J. Upon the Admin. R. and Cross-Mot. for J. Upon the Admin. R. (Def.'s Opp'n) at 19.

On a more basic level, Dorado contends that that the government failed to adhere to a principle of fairness in requesting and assessing the employees' residency documentation. See Pl.'s Resp. at 17–18; Oral Argument on Cross-Mots. for J. on the Admin. R. at 27:45–58. It stresses that although it repeatedly asked SBA whether it needed anything else in making its determination, SBA never asked for any additional documentation for these three employees; and it asserts that "[h]ad the SBA told Dorado that the sworn testimony of residency had to come from each employee when it asked for supplemental documents, Dorado would have provided that information." See Pl.'s Mem. at 4–5; Pl.'s Resp. at 17–18.

This argument lacks merit. Under the regulatory scheme, Dorado alone bore the burden of proving its eligibility to SBA. See AR Tab 19 at 522 (warning that "failure to provide sufficient information or supporting documents to establish Dorado's HUBZone eligibility may result in an adverse inference"); cf. 13 C.F.R. § 126.306(c) (when applying for HUBZone status, "[t]he burden of proof to demonstrate eligibility is on the applicant concern"). And although not included in the D/HUB's request for documentation, specific instructions about what to do if a driver's license or voter registration is not available can be found on SBA's website. See HUBZone Program/Frequently Asked Questions, supra (explaining that if an employee has no driver's license or voter registration, "[t]he employee must submit a notarized statement declaring HUBZone residency and explaining why documentation corroborating residency in a HUBZone . . . is unavailable"). Nor does Dorado contend that it specifically asked SBA what documentation it should submit for these three employees; rather, it asked general questions about whether SBA needed anything else in making its decision. SBA thus did not somehow treat Dorado unfairly by basing its decision on the documentation Dorado chose to submit.

In summary, the AA/GCBD did not err by excluding the twelve individuals discussed above from Dorado's list of HUBZone-resident employees at the time of the award. Thus, he properly determined that Dorado did not meet the 35% residency requirement at the time of the award. Because the AA/GCBD did not err, Dorado's motion for judgment on the administrative record must be **DENIED**.[15]

## CONCLUSION

For the reasons discussed above, Dorado's motion for judgment on the administrative record and its motion to supplement the administrative record are **DENIED**, and the government's cross-motion for judgment on the administrative record

---

[15] Because the SBA correctly concluded that Dorado did not meet the 35% residency requirement at the time of the award, it is not necessary to address Dorado's argument that the SBA committed error when it found that Dorado did not meet that requirement at the time of the offer. Nor is it necessary to decide whether the latter claim is ripe for review given that the AA/GCBD did not address it.

is **GRANTED**. The Clerk shall enter judgment accordingly. Each side shall bear its own costs.

      **IT IS SO ORDERED.**

s/ Elaine D. Kaplan           
ELAINE D. KAPLAN
Judge
